**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **BUTTERS LIVING TRUST,** | : | **CIVIL NO. 4:12-CV-272** |
| | : | |
| **Plaintiff,** | : | |
| **v.** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **SWEPI, INC.,** | : | |
| | : | |
| **Defendant.** | : | |

## MEMORANDUM OPINION

### I.     Introduction, Procedural History and Statement of Facts

This case, which comes before us on a summary judgment motion, presents a dispute regarding the interpretation and construction of an habendum clause in an oil and gas lease, a clause which enables the lessee, an oil and gas producer, to extend the term of the lease by undertaking certain activities upon the leased property.

Specifically, we are called upon to ascertain the meaning of a December 2009 addendum to an oil and gas lease between the parties which contained the following habendum clause: "In the event a pooled unit is created which encompasses land located outside the lease premises and some, but not all, of the lease premises, *any drilling or reworking operations on or production from a well located on that pooled unit shall continue this Lease in full force and effect* but only as to that part of the lease premises contained within the pooled unit." (Emphasis added). The

parties present two starkly contrasting meanings to this language, with the plaintiff insisting that the language means that the lease term could only be extended if "drilling" occurred during the original term of the lease, and the defendant arguing that this clause allows for the extension of the lease term if the defendant engages in "drilling . . . operations" prior to the expiration of the original lease term, a term that the defendants construe as including preparatory drilling operations. This linguistic dispute, in turn, has real significance for the parties since it is undisputed in this case that SWEPI performed substantial preparatory drilling work in connection with a unitized property leased from the plaintiff prior to expiration of the original term of the lease, but did not actually insert a drill into the earth until shortly after the original lease term expired.

On January 2, 2012, the plaintiff, Butters Living Trust, filed this action in the Court of Common Pleas of Tioga County, seeking declaratory relief regarding the interpretation of this lease agreement between Butters and SWEPI, Inc.. (Doc. 1.) On February 10, 2012, SWEPI removed this state court action to the United States District Court for the Middle District of Pennsylvania. (Doc. 1.) At the close of discovery, SWEPI then moved for summary judgment, (Doc. 19), a motion which has been fully briefed, (Docs. 20-22, 26, 29-30, 39, and 40), by the parties. Therefore, this matter is now ripe for resolution. For the reasons set forth below, the motion will be denied.

With respect to the interpretation of this particular hydro-carbon lease, the undisputed facts reveal the following: The plaintiff, the Butters Living Trust (the "Trust" or "Plaintiff"), is a trust formed under the laws of Pennsylvania. The trust assets include certain real estate holdings in the northern tier counties of Pennsylvania , and the oil and gas leases relating to those real estate holdings. Gary R. Butters (Mr. Butters) serves as a trustee for the Trust, and has served in this position at all times relevant to this lawsuit. While Mr. Butters' principal entrepreneurial activities have involved businesses outside the oil and gas industry, in his capacity as a trustee of the Butters Living Trust, Mr. Butters has had significant dealings in this industry, and has negotiated dozens oil and gas leases on behalf of the trust.

The defendant, SWEPI, is a natural gas producer, which has in the past held leasehold interests on properties which comprise part of the Butters' Living Trust, leases that permit SWEPI to, *inter alia*, engage in natural gas exploration among Marcellus shale deposits located within these leased properties. In some instances, the leases currently held by SWEPI were previously negotiated by other oil and gas producers.

Among its real estate holdings, the Butters Living Trust is the owner of oil, gas, and mineral rights for several contiguous parcels of property located in

Charleston Township, Tioga County, Pennsylvania, totaling approximately 81.38 acres, which Butters acquired on December 11, 2008 from Allan J. Lilley and Melanie J. Lilley (the "Lilleys"). At the time Butters acquired this property from the Lilleys, the property was subject to an oil and gas lease originally executed between the Lilleys and Phillips Production Company. Phillips, in turn, later transferred this lease to East Resources, Inc., which in turn subsequently transferred the lease to SWEPI.

This lease was executed on May 28, 2001 and had a primary of ten years. Thus, the lease would expire at midnight on May 27, 2011, unless extended. After purchasing this property from the Lilleys, the Trust and East executed an amendment to the Lease on December 18, 2009. The purpose of the amendment was to modify the "Unitization"[1] paragraph of the lease to allow East, and later

---

[1]"Pooling" or "unitizing" is a term of art in the field of hydro-carbon leasing and is described in the following terms:

> Because there may be a pool of oil under several tracts of land with each tract having a different ownership, yet all of the oil might be removed by a single well on one of the tracts as a result of its fluidity to the detriment of the owners of the other tracts, a need has arisen for laws providing for the pooling of diverse interests into one or more drilling units for the production of oil. A "pool," for purposes of a unitization act, has been deemed to include commingled oil and gas well formations constituting a single and separate natural reservoir characterized by a single pressure system, so that the production of petroleum from one part of the pool affects the reservoir pressure

SWEPI, to unitize and produce hydro-carbon fuels from Marcellus shale formations found within the leased properties.

This amendment was the product of negotiations between Butters and SWEPI's predecessor, East Resources. According to Mr. Butters, who directly

---

throughout its extent."Pooling" refers to the bringing together of two or more small or irregularly shaped tracts of land to form a drill site in connection with a program of uniform well spacing with the arrangement being essentially a species of joint venture whereby the various owners of the tracts pooled join to drill a well and to share in the benefits to be expected. The primary legal consequence of pooling oil and gas leases is that production and operations anywhere on the pooled unit are treated as if they have taken place on each tract within the unit. An oil and gas lessee's pooling decision will be upheld unless the lessee pools in bad faith. Where a lessee pools oil and gas leases in good faith, the lessee is relieved of the obligation to reasonably develop each tract separately, or to drill off-set wells on other tracts included in the unit to prevent drainage by a well on one or more of such tracts. If oil and gas leases are not pooled in good faith, production will be considered to take place only on the actual tract upon which it occurs, and production from a unit well will not maintain off-site leases."Unitization" or "unit operation" represents the development and operation of an oil pool as a unit, and involves the consolidation or merger of all of the interests in the pool and the designation of one or more of the parties as operator. The unitization of oil and gas production permits the entire field or a substantial part of it to be operated as a single entity without regard to surface boundary issues. Unitization effects a merging of all the involved gas and oil leases into one contract and a vesting in all the lessors of a right to participate in any royalty produced on any tract.

38 Am. Jur. 2d. § 172 (2012).

participated in these negotiations, with respect to the secondary term of the lease, the proposed amendment initially prepared by East stated:

> The commencement [sic] drilling completion of or production from a well on any portion of the unit created under the terms of this paragraph shall have the same effect upon the terms of this lease as if a well were commenced, drilled, completed or producing on the land described herein.

Butters contends that he was unsatisfied with the inclusion of the phrase "commencement [sic] drilling" in this addendum because he regarded it as vague. Therefore, Mr. Butters, acting on behalf of the Trust, would not agree to the term extension language initially proffered by East. Negotiations then ensued, negotiations in which Mr. Butters alleges that he sought an amendment of the lease to provide that the secondary term of the lease would only be triggered by "a definable moment."

Ultimately these negotiations culminated on December 18, 2009, with the execution of a lease addendum between the Trust and East which included the following habendum clause:

> In the event a pooled unit is created which encompasses land located outside the lease premises and some, but not all, of the lease premises, *any drilling or reworking operations on or production from a well located on that pooled unit shall continue this Lease in full force and effect* but only as to that part of the lease premises contained within the pooled unit. (emphasis added).

In the weeks immediately preceding the May 27, 2011, expiration of the primary term of this lease, SWEPI undertook preparatory drilling activities on several unitized tracts which were associated with this leased property, tracts referred to as the Propheta Unit and the Salevesky Unit. These preparatory activities included surveying, permitting, site preparation and grading , timber removal, access road development, and well pad installation. It is undisputed, however, that actual drilling did not occur at these sites until days or weeks after the May 27, 2011, expiration of the primary lease term.

On May 31, 2011, Butters, through its counsel, Williams Stokes, notified SWEPI that, in its view, the lease had expired since no drilling had commenced on the site. While the parties were discussing this issue, Butters then engaged in other negotiations relating to mineral rights on this property. As part of these negotiations, on June 30, 2011, more than one month after the alleged expiration of the primary term of the Lease, the Trust conveyed a portion of the surface rights of the property to Vanderra Resources, LP.  This deed conveying these surface rights also specifically reserved to the Trust the oil, gas, and mineral rights,

> including the right to lease those rights and to receive rents and royalties therefrom, and the right to retain all past *and future rents and royalties from the existing oil*

*and gas lease on the property*, including any extension or renewal of the existing lease. (emphasis added).

The Vanderra property deed was prepared by the same law firm that is representing the Trust in the instant lawsuit. At the time the Vanderra property deed was executed, SWEPI contends that the Trust had no reason to believe that there was any other oil and gas lease related to the property, other than the lease at issue in this lawsuit. Thus, the Vanderra property deed can be read to imply that there is an existing gas and oil lease on this property in June 2011, a position that is inconsistent with the posture taken by Butters in this litigation. Butters disputes this interpretation as a factual matter, insisting that this language was simply surplusage that was inadvertently included in the deed.

During the Summer and Fall of 2011, the parties continued to engage in discussions and negotiations regarding the terms and extension of this lease. In the course of these discussions, counsel for the plaintiff, William Stokes, articulated the position voiced by the plaintiff in this litigation; namely, that the lease term had expired because SWEPI had not commenced drilling by May 27, 2011. Stokes alleges that on or about October 10, 2011, in a conversation with a SWEPI employee assigned to this matter, Brad Hallum, Stokes informed Hallum of Butters' position regarding the interpretation of this lease and confirmed that

no drilling had occurred on the property. According to Stokes, in this conversation Hallum conceded that if no drilling had occurred that SWEPI would be interested in negotiating a new lease with Butters, remarks that the plaintiff construed as at least a tacit admission that Butters' interpretation of the lease was correct. For his part, Hallum has a far less definitive recollection of the conversation, has previously testified to having little independent recollection of this discussion, and has suggested that he did not intend to concede that the lease had expired but was merely accepting that assumption for purposes of the discussion.

It is against this contentious factual background that this matter is presented to us for summary judgment.

## II.    <u>Discussion</u>

### B.    <u>Rule 56–The Legal Standard.</u>

The defendant has moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, which provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P., Rule 56 (a). Through summary adjudication a court is empowered to dispose of those claims that do not present a "genuine issue as to any material fact," Fed. R. Civ. P. 56, and for which a trial would be "an empty and unnecessary formality."

Univac Dental Co. v. Dentsply Int'l, Inc., No. 07-0493, 2010 U.S. Dist. LEXIS 31615, at *4 (M.D. Pa. Mar. 31, 2010).

The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. Id. at 248-49.

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004). Once the moving party has shown that there is an absence of evidence to support the nonmoving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. Celotex, 477 U.S. at 322. Summary judgment is also appropriate if the non-moving

party provides merely colorable, conclusory, or speculative evidence. <u>Anderson</u>, 477 U.S. at 249. There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts. <u>Id.</u> at 252; <u>see also</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). In making this determination, the Court must "consider all evidence in the light most favorable to the party opposing the motion." <u>A.W. v. Jersey City Pub. Schs.</u>, 486 F.3d 791, 794 (3d Cir. 2007).

Moreover, a party who seeks to resist a summary judgment motion by citing to disputed material issues of fact must show by competent evidence that such factual disputes exist. Further, "only evidence which is admissible at trial may be considered in ruling on a motion for summary judgment." <u>Countryside Oil Co., Inc. v. Travelers Ins. Co.</u>, 928 F.Supp. 474, 482 (D.N.J.1995). Thus, a party may not rely upon inadmissible hearsay assertions to avoid summary judgment. Therefore, where a party simply presents inadmissible hearsay declarations in an attempt to establish a disputed material issue of fact, courts have typically rebuffed these efforts and held instead that summary judgment is appropriate. <u>See, e.g.</u>, <u>Synthes v. Globus Medical, Inc</u>., No. 04-1235, 2007 WL 2043184 (E.D.Pa. July 12, 2007); <u>Bouriez v. Carnegie Mellon Univ.</u>, No. 02-2104, 2005 WL 2106582,* 9 (W.D.Pa. Aug. 26, 2005); <u>Carpet Group Int'l v. Oriental Rug Importers Assoc., Inc.</u>, 256 F.Supp.2d 249 (D.N.J. 2003).

Similarly, it is well-settled that: "[o]ne cannot create an issue of fact merely by . . . denying averments . . . without producing any supporting evidence of the denials." Thimons v. PNC Bank, NA, 254 F. App'x 896, 899 (3d Cir. 2007) (citation omitted). Thus, "[w]hen a motion for summary judgment is made and supported . . ., an adverse party may not rest upon mere allegations or denial." Fireman's Ins. Co. of Newark NJ v. DuFresne, 676 F.2d 965, 968 (3d Cir. 1982), see Sunshine Books, Ltd. v. Temple Univ., 697 F.2d 90, 96 (3d Cir. 1982). "[A] mere denial is insufficient to raise a disputed issue of fact, and an unsubstantiated doubt as to the veracity of the opposing affidavit is also not sufficient." Lockhart v. Hoenstine, 411 F.2d 455, 458 (3d Cir. 1969). Furthermore, "a party resisting a [Rule 56] motion cannot expect to rely merely upon bare assertions, conclusory allegations or suspicions." Gans v. Mundy, 762 F.2d 338, 341 (3d Cir. 1985)(citing Ness v. Marshall, 660 F.2d 517, 519 (3d Cir. 1981)). In particular, a plaintiff cannot avoid summary judgment by simply relying upon a self-declaration that he has authored which relies not on evidence, but on the plaintiff's own interpretation of events and, essentially, opinion testimony. See Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990) (the nonmoving party may not defeat a properly supported summary judgment motion by simply substituting the "conclusory allegations of the complaint or answer with the conclusory allegations of an affidavit."); Iseley v. Beard, No. 02-2006, 2009 U.S. Dist. LEXIS 52014, *32

(M.D. Pa. Mar. 30, 2010) (conclusory allegations contradicted by documentary evidence cannot be accepted as true).

Yet, while "only evidence which is admissible at trial may be considered in ruling on a motion for summary judgment," <u>Countryside Oil Co., Inc. v. Travelers Ins. Co.</u>, 928 F.Supp. 474, 482 (D.N.J.1995), and "a party resisting a [Rule 56] motion cannot expect to rely merely upon bare assertions, conclusory allegations or suspicions," <u>Gans v. Mundy</u>, 762 F.2d 338, 341 (3d Cir. 1985), the Court must "consider all evidence in the light most favorable to the party opposing the motion." <u>A.W. v. Jersey City Pub. Schs.</u>, 486 F.3d 791, 794 (3d Cir. 2007). Therefore, in a case where the parties' pleadings reveal disputes regarding the admissibility of specific evidence, the principles governing consideration of summary judgment motions–which enjoin us to examine the evidence in a light most favorable to the party opposing the motion–also call upon us to resolve all genuine disputes concerning the admissibility of specific items of evidence in favor of the party opposing the motion.

### B.  Legal Standards Governing Oil and Gas Lease Interpretation

"Under Pennsylvania law, 'a lease is in the nature of a contract and is controlled by principles of contract law.' <u>T.W. Phillips Gas and Oil Co. v. Jedlicka</u>, —— Pa. ——, 42 A.3d 261, 267 (Pa.2012). The lease 'is to be construed in accordance with

the terms of the agreement as manifestly expressed,' <u>J.K. Willison v. Consolidation Coal Company</u>, 536 Pa. 49, 637 A.2d 979, 982 (1994), and the language of the lease should be given its 'accepted and plain meaning, rather than the silent intentions of the contracting parties.' <u>T.W. Phillips</u>, 42 A.3d at 261. The burden of proof is borne by the party seeking to terminate the lease. <u>Id.</u> (citing <u>Jefferson County Gas Co. v. United Natural Gas Co.</u>, 247 Pa. 283, 286, 93 A. 340, 341 (1915))." <u>Stewart v. SWEPI, LP</u>, 4:11-CV-2241, 2013 WL 170181 (M.D. Pa. Jan. 16, 2013).

The law governing the interpretation of contracts under Pennsylvania law is also familiar and well-settled. "When a written contract is clear and unequivocal, its meaning must be determined by its contents alone." <u>Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.</u>, 619 F.2d 1001, 1010 (3d Cir. 1980) (citation omitted); <u>Mace v. Atl. Ref. & Mktg. Corp.</u>, 785 A.2d 491, 496 (Pa. 2001). Further, when construing a written contract which has both printed, and hand-written terms, additional rules of construction apply: "When a contract contains either hand or typewritten terms which are in conflict with the preprinted terms, the pre-printed terms must always yield to the other terms because the hand or typewritten term presumably evidences the deliberate expression of the parties' true intent." <u>Flatley by Flatley v. Penman</u>, 632 A.2d 1342, 1345 (Pa.Super. 1993).

A contract is ambiguous if it is reasonably susceptible to different constructions

and capable of being understood in more than one sense.  <u>St. Paul Fire & Marine Ins. Co. v. Lewis</u>, 935 F.2d 1428, 1431 (3d Cir. 1991).  Under Pennsylvania law, ambiguous contracts are interpreted by the trier of fact, and unambiguous contracts are interpreted as a matter of law. <u>Mellon Bank</u>, 619 F.2d at 1011 n.10.  As the United States Court of Appeals for the Third Circuit has observed several basic legal tenets govern Pennsylvania law regarding the interpretation of contractual language and terms:

> The fundamental rule in interpreting the meaning of a contract is to ascertain and give effect to the intent of the contracting parties. The intent of the parties to a written agreement is to be regarded as being embodied in the writing itself. The whole instrument must be taken together in arriving at contractual intent. Courts do not assume that a contract's language was chosen carelessly, nor do they assume that the parties were ignorant of the meaning of the language they employed. When a writing is clear and unequivocal, its meaning must be determined by its contents alone. Only where a contract's language is ambiguous may extrinsic or parol evidence be considered to determine the intent of the parties**.** A contract contains an ambiguity if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. This question, however, is not resolved in a vacuum. Instead, contractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts. In the absence of an ambiguity, the plain meaning of the agreement will be enforced. The meaning of an unambiguous written instrument presents a question of law for resolution by the court.

Great Am. Ins. Co. v. Norwin Sch. Dist., 544 F.3d 229, 243 (3d Cir. 2008) (internal citation omitted) (citing Murphy v. Duquesne Univ., 777 A.2d 418, 429-30 (Pa. 2001)).

Furthermore, "[i]n construing the language of a contract, ' "[t]echnical terms and words of art are [to be] given their technical meaning unless the context or a usage which is applicable indicates a different meaning." ' Fischer & Porter Co. v. Porter, 364 Pa. 495, 72 A.2d 98, 101 (1950) (alteration in original) (citation omitted). Otherwise, ' " words employed in a contract will be assigned their clear and plain, common, general, generally accepted, grammatical and ordinary, natural' or normal meaning or sense." ' Independent Oil Workers v. Mobil Oil Corp., 441 F.2d 651, 653 n. 4 (3d Cir.1971) (citation omitted)." Allegheny Energy v. DQE, Inc., 74 F. Supp. 2d 482, 513 (W.D. Pa. 1999) aff'd sub nom. Allegheny Energy, Inc. v. DQE, Inc., 216 F.3d 1075 (3d Cir. 2000). Where a contract is not ambiguous, but is instead subject to only one reasonable interpretation, it is appropriate for a district court to resolve the issue of interpretation as a matter of law. See Norfolk S. Ry. v. Reading Blue Mountain & N. Ry., 346 F. Supp. 2d 720, 725 (M.D. Pa. 2004) ("A court may grant summary judgment on the interpretation of a contract when the contract is susceptible to only one reasonable interpretation . . . When the terms of the contract are unambiguous, the express language of the agreement controls its meaning.").

However, when a party argues that a contract is sufficiently ambiguous to require parol evidence, that party must advance an alternate meaning of the contract which is commercially reasonable. See County of Mercer v. Unilect Corp., 612 F.Supp.2d. 638, 649 (W.D. Pa. 2009)(collecting cases). Thus, when addressing these legal and factual issues we are called upon to consider the competing evidence and ascribe the most commercially reasonable interpretation to the parties' words and actions. See Glenn Distributors Corp. v. Carlisle Plastics, Inc. 297 F.3d 294, 301 (3d Cir. 2002).

Several further guiding principles apply when interpreting the language of an habendum clause in an oil and gas lease, principles that have developed over time in the specialized field of oil and gas law, and principles which were aptly summarized by our colleague, Judge Brann, in Roe v. Chief Exploration & Dev. LLC, 4:11-CV-00816, 2013 WL 4083326 (M.D. Pa. Aug. 13, 2013). In Roe this court observed that "the habendum clause—that is, the clause in each oil and gas lease that sets forth the duration of the lessee's interest—has in fits and starts evolved to better meet the needs of lessors and lessees. Fixed term leases were abandoned in favor of leases that continued for as long as the premises remained productive." Roe v. Chief Exploration & Dev. LLC, 4:11-CV-00816, 2013 WL 4083326 (M.D. Pa. Aug. 13, 2013). While the outcome in these cases turns on the actual language used by the parties, over time the process of reconciling these interests has led courts and commentators to conclude

that, with respect to habendum clauses:

> The general rule is that actual drilling is unnecessary, but the location of well sites, hauling lumber on the premises, erection of derricks, providing a water supply, moving machinery on the premises and similar acts preliminary to the beginning of the process of drilling, when performed with the bona fide intention to proceed with diligence toward the completion of the well, constitute a commencement or beginning of a well or drilling operations within the meaning of the lease.

> <u>Summers Oil and Gas</u> § 15:19. Another offers:

> Although there is some limited authority to the contrary, in general it appears that the courts have been ready to find the commencement of operations (or the pursuit of drilling operations) where only the most modest preparations for drilling have been made....

> In brief, drilling operations may be described as any work or actual operations undertaken or commenced in good faith for the purpose of carrying out any of the rights, privileges or duties of the lessee under a lease, followed diligently and in due course by the construction of a derrick and other necessary structures for the drilling of an oil and gas well, and by the actual operation of drilling in the ground.

> Patrick H. Martin & Bruce M. Kramer, <u>Williams & Meyers, Oil and Gas Law</u> § 618.1 (2012).

<u>Roe v. Chief Exploration & Dev. LLC</u>, 4:11-CV-00816, 2013 WL 4083326 (M.D. Pa. Aug. 13, 2013).

There is an economic sense and commercial reasonableness to this general rule

of construction relating to habendum clauses. As this court noted in <u>Roe</u>:

> Giving the lessee "great leeway" in manifesting his intent to drill is eminently sensible in light of the interests of the parties. From the perspective of the lessee acting in good faith, the quantum and onerousness of necessary "operations" should be minimal. If the hurdle is too high, the lessee risks sinking investment into preparations for drilling as the lease's primary term counts down, only to fall short of the mark and lose the lease. On the other side, the lessor—ex ante, of course—should be relatively indifferent to what the lessee does by way of preparations for drilling prior to expiration of the lease's primary term. This is so for the simple reason that the ordinary lessor has no way of predicting how those preparations will ultimately relate to whether or when a well will be completed. Much more important to the ordinary lessor should be the diligence of the lessee in continuing operations, as the courts and authorities have recognized. Lessors with idiosyncratic preferences, of course, are free depart from the norm by writing their leases accordingly

<u>Roe v. Chief Exploration & Dev. LLC</u>, 4:11-CV-00816, 2013 WL 4083326 (M.D. Pa. Aug. 13, 2013)(footnotes omitted).

Thus, in this case the parties' dispute is presented against a legal backdrop in which courts, as a general rule, favor interpretations of habendum clauses which give great leeway to the lessee, in this case SWEPI, in manifesting an intent to drill, unless the lessor, Butters, can demonstrate an agreed-upon idiosyncratic preference for a more restrictive approach to the interpretation of a particular oil and gas lease extension clause.

**C.    Factual Disputes Remain Regarding the Interpretation of the Habendum Clause in This Lease**

Cast against this legal backdrop we find that the parties have identified a series of sharply drawn, contrasting positions in this case, positions which ultimately rest, in large measure, on disputed factual matters, making summary judgment inappropriate.

**1.    The Parties' Competing Views Regarding the Meaning of the Lease**

At the outset, the competing interpretations of this particular habendum clause can be simply summarized. In this case, Butters insists that it had what Judge Brann would call an idiosyncratic preference to depart from the norm in this field in terms of oil and gas lease extension practice. Butters alleges that it wished to tie the extension of this lease term to a "definable" event, actual drilling on the leased property. To achieve this goal, Butters contends that it negotiated the contested language of the habendum clause, "In the event a pooled unit is created which encompasses land located outside the lease premises and some, but not all, of the lease premises, *any drilling or reworking operations on or production from a well located on that pooled unit shall continue this Lease in full force and effect* but only as to that part of the lease premises contained within the pooled unit." (Emphasis

added). Butters then insists that the disputed and highlighted language of this clause has a meaning that is somewhat different and more specific than the words actually used by the parties and the clause should be construed to read that the lease is extended whenever: " [1] any drilling[,] or [2] reworking operations on[,] or [3] production from a well located on that pooled unit" occurs. Construed in this way, it is Butters' position that the lease expired since actual drilling did not occur on these leased lands prior to the expiration of the original term of the lease on May 27, 2011.

For its part, SWEPI contends, consistent with case law construing similar lease provisions, that "the term 'engaged in drilling or reworking operations' is not ambiguous and means 'engaged in drilling operations or reworking operations.' Both the context and plain language of the habendum clause compel this conclusion [since] the habendum clause's use of the word 'operations' after the words 'drilling or reworking' denotes that the words 'drilling' and 'reworking' are adjectives that modify the noun 'operations.' " <u>Anderson v. Hess Corp.</u>, 649 F.3d 891, 897 (8th Cir. 2011). Thus, SWEPI would also give the disputed and highlighted language of this clause a meaning that is somewhat different and more specific than the words actually used by the parties and invites us to find that the phrase "any drilling or reworking operations" actually means "any drilling [operations] or reworking operations." This construction of the habendum clause would result in an extension of the

lease according to SWEPI since it is undisputed that preparatory drilling operations had been undertaken prior to the expiration of the original lease term.

Each of these competing interpretations of the contract draws some, albeit imperfect, linguistic support from the words actually used by the parties. Yet, each of these interpretations is also either linguistically flawed to some degree, or asserts a degree of textual clarity that we find is lacking from the words actually chosen by the parties. Therefore, the words of the agreement, standing alone, do not in our view ineluctably lead to a single, simple interpretation of this language.

### 2. The Parties' Contrasting and Factually Contested Claims

#### a. Butters' Contested Claims

Perhaps recognizing this fact, the parties have each advanced multi-faceted legal and factual arguments in support of their respective constructions of this contract clause, arguments which in many instances turn on disputed factual matters. For its part, Butters' argument is somewhat akin to a three-legged stool.

The first leg of this argument is contextual. Butters concedes, but attempts to distinguish, the extensive case law cited by the defendant which consistently construes similar habendum provisions in the precise manner urged by SWEPI, and invites us instead to focus on factual issues relating to the actual negotiations between the parties

that led to the execution of this lease agreement, negotiations which Butters alleges were driven by the plaintiff's interest in explicitly linking lease extension to a definable event, actual drilling on the leased property. Thus, the first leg to Butters' legal claim is a fact-bound assertion regarding the negotiations which led to this choice of lease language. That fact-bound assertion, in turn, inspires a reply by SWEPI which combines questions of law and fact. SWEPI asserts that the language actually used in the lease is a term of art in the oil and gas industry, a term of art that is commonly understood to mean that the lease is extended whenever the lessee engages in preparatory drilling activity.

SWEPI's reply then inspires a fact-bound rejoinder by Butters, which argues both that the defendant's expert witness proof of this term of art is inadequate, and contends that Mr. Butters was not sufficiently conversant in the oil and gas industry to be held to knowledge of a trade term of art. Butters' rejoinder is met by a sur-reply from SWEPI which, once again, combines questions of law and fact, with SWEPI arguing, in part, that Butters had sufficient industry sophistication and experience by virtue of his past oil and gas lease negotiations to be held to an understanding of these industry terms of art.

The second leg of Butters' argument is textual, and rests on the proffered testimony of Gertrude Block, a Lecturer Emerita at the Levin College of Law in

Gainesville Florida, who appears to have no specialized background or experience in oil and gas law, but who offers her expert linguistic opinion on the meaning of the habendum clause at issue here and concludes that the clause should be read as the plaintiff interprets this text. This evidence, which combines questions of fact and purported legal analysis, in turn, invites both a legal and a factual challenge by SWEPI, which assails the competence of Block as an expert witness in this arena, and the admissibility of this testimony, demanding an evidentiary Daubert hearing on the admissibility of this evidence.

Finally, Butters attempts to bolster its interpretation of this clause by asserting that in an October 2011 conversation with Butters' former counsel, William Stokes, a representative of SWEPI, Brad Hallum , made direct or tacit admissions to the effect that this habendum clause required actually drilling on the leased property by SWEPI during the primary term of the lease before that lease could be extended. As to this third, fact-bound leg of the plaintiff's position, the materials provided by the parties reflect factual discord, confusion, and uncertainty. Plaintiff's former counsel attests that in this conversation SWEPI's employee, Hallum, made statements which could be construed as including at least tacit acknowledgments of the validity of Butters' position regarding the interpretation of this lease. However, the clarity and probative value of this evidence is clouded by the fact that Hallum has a far less definitive

recollection of the conversation, has previously testified to having little independent recollection of this discussion, and has suggested that he did not intend to concede that the lease had expired but was merely accepting that assumption for purposes of the discussion. SWEPI also disputes whether this conversation is even admissible in these proceedings, a legal and evidentiary issue which in our view also requires further development of the factual record, and may entail witness credibility assessments.

### b. SWEPI's Disputed Assertions

SWEPI, in turn, supports its position regarding its interpretation of this habendum clause through its own legal and factual triad. At the outset, as a legal matter SWEPI observes that numerous courts have interpreted oil and gas leases containing language that is similar to the language employed by the parties in this case in a fashion which would extend the term of the lease upon the lessee's initiation of significant preparatory drilling operations without the necessity of actual drilling on the site. See e.g., Anderson v. Hess Corp., 649 F.3d 891, 897 (8th Cir. 2011); Manzano Oil Corp. v. Chesapeake Operating, Inc., 178 F. Supp. 2d 1217, 1219-1220 (D.N.M. 2001); Tri M Petroleum Co. v. Getty Oil Co., 792 F.2d 558 559 (5th Cir. 1986)); Lamoco, Inc. v. Hughes, 850 So. 2d 67,71 (La. Ct. App. 2003); E. Energy, Inc. v. SBY P'ship, No. 01-87-0967-CV, 1988 Tex. App. LEXIS 505, *9 (Tex. App. March 10, 1988) French v. Tenneco Oil Co., 725 P.2d 275, 277 (Okla. 1986);

<u>Sheffield v. Exxon Corp.</u>, 424 So. 2d 1297, 1300-1302 (Ala. 1982); <u>Chandler v. Drummet</u>, 557 S.W.2d 313, 314 & 316 (Tex. App. 1977); <u>Wagner v. Mounger</u>, 175 So. 2d 145, 151 (Miss. 1965); <u>Roberts v. Corum</u>, 112 So. 2d 550, 552 & 555 (Miss. 1959); <u>Reid v. Gulf Oil Corp.</u>, 323 S.W.2d 107, 117 (Tex. App. 1959). Butters contests this position, advancing legal and factual arguments in opposition to this construction of the habendum clause at issue here. Legally, Butters attempts to distinguish all of these cases. Factually, Butters also asserts that the evidence shows that it had what Judge Brann would call describe as an idiosyncratic preference to depart from the norm in this field, and drafted this lease language to achieve that goal.

The second leg of SWEPI's legal and factual triad rests on industry practice and terms of art in this field. In this respect, SWEPI proffers testimony that the phrase drilling and re-working operations is an industry term of art which is commonly understood to permit lease extension when preparatory drilling activities are undertaken at a site. As we have previously noted, this position has inspired a multi-faceted legal and factual dispute between the parties regarding terms of art, and whether Mr. Butters can fairly be held to an understanding of those terms of art, questions which we believe entail a significant factual component and may require credibility determinations.

Finally, SWEPI points to another factual matter whose significance is disputed by the parties to support its position regarding the proper construction of this lease. Specifically, SWEPI notes that in June, 2011, within weeks of Butters' notification to SWEPI that the lease term had expired, Butters prepared and executed a deed relating to this property which expressly referred to conveyance of the property subject to outstanding hydro-carbon leases, an assertion which SWEPI contends constitutes at least a tacit admission by Butters that this lease–the only active lease relating to the property–had not, in fact, expired. For its part, Butters contests the relevance of this event, characterizing this deed language as mere boilerplate that was not intended to contradict its prior views regarding the termination of the lease that were reported to SWEPI in the end of May, 2011.

Thus, once the parties foray beyond the words used in the contract, their respective positions are marked by legal and factual disputes.

### III.    Conclusion

Considering this constellation of controversies, in our view the competing positions of the parties in this case simply cannot be reconciled on a motion for summary judgment. While the plaintiff ultimately bears an exacting burden of proof and persuasion in this matter, which requires success on many facets of its claim, the

paths chosen by the parties to advance their respective interpretations of this habendum clause entail analyses of legal and factual matters in a factual context where the parties contest the credibility of witnesses, the factual predicates to the admissibility of evidence, the competence of proffered experts, and the inferences to be drawn the facts, some of which entail weighing testimony relating to historic recollection of conversations which took place several years ago. In this setting, we cannot conclude that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P., Rule 56 (a). Therefore the motion for summary judgment will be denied.

An appropriate order will issue.


*/s/ Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

Dated: October 18, 2013